IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EURO MOTORCARS GERMANTOWN, INC.
19750 Germantown Road
Germantown, Maryland 20874,

                                Plaintiff,

                      v.

MANHEIM AUCTIONS, INC.
1190 Lancaster Road
Manheim, Pennsylvania 17545,

VICKY MANCHESTER
4 Angus Drive
Stevens, Pennsylvania  17578,

MAZ COMPANY
25284 Pleasant Valley Road, #132
Chantilly, Virginia 20152,

And

NADER AMIRKABIRIAN
18280 Mid Ocean Place
Leesburg, Virginia  20176,

                                Defendants.

CIVIL ACTION NO:

## COMPLAINT

NOW COMES Plaintiff Euro Motorcars Germantown, Inc. ("EMG"), by and through its counsel, Dilworth Paxson LLP, and files the within Complaint against Manheim Auction, Inc. ("Manheim"), Vicky Manchester ("Manchester"), Maz Company ("Maz Company"), and Nader Amirkabirian ("Nader") as follows:

## PARTIES

1.      EMG is a Delaware corporation qualified to do business in the State of Maryland, as a Mercedes Benz automobile dealership, having a principal place of business at 19750 Germantown Road, Germantown, Maryland 20874.  EMG sells and services new and used

vehicles, along with parts and other Mercedes Benz products.

2.     Upon information and belief, Manheim is a corporation qualified to do business in the Commonwealth of Pennsylvania, having its principal place of business at 1190 Lancaster Road, Manheim, Pennsylvania 17545.

3.     Upon information and belief, Manchester is an adult individual with a last known address of 4 Angues Drive, Stevens, Pennsylvania 17578.  At all relevant times, Manchester was employed by Manheim.

4.     Upon information and belief, Maz Company is a sole proprietorship conducting business in the Commonwealth of Virginia, having its principal place of business at 25284 Pleasant Valley Road, Chantilly, Virginia  20152.  At all relevant times, Maz Company operated a wholesale used car business.

5.     Upon information and belief, Nader is an adult individual with a last known address of 18280 Mid Ocean Place, Leesburg, Virginia  20176.  At all times relevant hereto, Nader was the owner and sole proprietor of Maz Company.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there exists complete diversity of citizenship between Plaintiff and Defendants in this case and because the claim exceeds $75,000.00.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because, among other things, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District at the Manheim auto auction in Manheim, Pennsylvania.

## FACTUAL BACKGROUND

8.     Defendant Manheim claims to be the world's largest, most comprehensive wholesale vehicle marketplace with 106 operating locations worldwide.   At all times relevant

11328642_13

hereto, Defendant Manheim operated its flagship location for the sale of used vehicles at 1190 Lancaster Road, Manheim, Pennsylvania ("the Manheim Auction House"). The Manheim Auction House is claimed to be the largest single auto auction house in the world.

9. At all times relevant hereto, EMG processed vehicles it owned through the Manheim Auction House for auction sale. These activities included sending used cars that it had acquired through trade-in or wholesale purchase to Manheim Auction House for auction sale, and selling certain other used cars that were also acquired through the Manheim Auction House auction sales.

10. Manheim's revenues and profits increase as the volume of vehicles sold at its auction increases, as it charges transaction fees to the seller and buyer for each vehicle sold through its auction process. As such, Manheim has a vested interest to ensure that large dealers like EMG continue to entrust their valuable wholesale inventory with the Manheim Auction House for auction sale. Manheim further had a vested interest in ensuring the continued success of wholesalers like the Maz Company and Nader, as such wholesalers often act as both buyers and sellers at the Manheim Auction House, providing Manheim with buy, sell and run fees for each transaction. In some EMG situations, Manheim would charge buyer's, seller's and run fees for both the purchase and the sale of vehicles in those instances when EMG purchased and then subsequently sold the same vehicle through the Manheim Auction House auction sales.

## EMG'S GENERAL RELATIONSHIP WITH MAZ COMPANY, NADER AND MANHEIM

11. Beginning in 2007, EMG used the services of Maz Company, and its principal, Nader, to sell its vehicles at the Manheim Auction House.

12. Maz Company had a dedicated lane at the Manheim Auction House for the purpose of selling used vehicles through the Manheim auction sales.

3

13.    At all relevant times, EMG entrusted certain vehicles it acquired through trade-ins and wholesale acquisition to Maz Company for sale through the Manheim Auction House.  In the normal course, Maz Company would sell an EMG vehicle through the Manheim Auction House, keep its fee, and then transfer the balance of the auction sales proceeds to EMG.  Manheim would withdraw its fees in conjunction with the sale of each vehicle.

14.    In accordance with its agreement with EMG, Maz Company was to timely and accurately report to EMG when an EMG vehicle was sold through the Manheim Auction House, along with the sales price for each such vehicle sold.

15.    At all times relevant hereto, EMG obtained dealer floor plan financing for certain of its used vehicle inventory from Mercedes Benz Financial Services, Inc. ("MBFS").  In accordance with EMG's dealer floor plan agreement with MBFS, MBFS acquired a lien on each EMG vehicle that it financed.

16.    EMG is required to account for each vehicle that MBFS has a security interest in pursuant to its financing agreement with MBFS.

17.    Pursuant to the terms of its agreement with MBFS, EMG must pay MBFS promptly after the sale of a vehicle, which is customary in the industry.

18.    In the automobile industry, any proceeds from the sale of a floor planned vehicle are considered to be taken "in trust" for the floor plan lender.  When a dealer does not pay its floor plan lender within the prescribed time period after the vehicle is sold, the dealer is said to be "out of trust."

19.    The used cars sold by Maz Company through the Manheim Auction House consisted of trade-in vehicles that were acquired with EMG funds or floor planned through MBFS and then turned over by EMG to Maz Company and Nader for reconditioning and resale

4

at the Manheim Auction House (the "Trade-in Vehicles"); wholesale purchases that were acquired with EMG funds or floor planned through MBFS, and then turned over to Maz Company and Nader for reconditioning and resale through the Manheim Auto House (the "Wholesale Vehicles"), including Wholesale Vehicles that were acquired and then sold through the Manheim Auction House auction sales.

### THE AUCTION SALE PROCESS – HOW IT WAS SUPPOSED TO WORK

20.     At all relevant times, the Trade-in Vehicles and the Wholesale Vehicles entrusted to Maz Company and Nader were taken to and stored on property owned by the Manheim Auction House for purpose of auction sale.

21.     Nader, Maz Company and Manheim all knew and understood that the Trade-in Vehicles and the Wholesale Vehicles remained the property of and were owned by EMG, unless and until they were sold through the Manheim Auction House process under circumstances that would lead to immediate payment of the net proceeds to EMG.

22.     Vehicles to be sold were assigned a specific "Run Week" designation by Manheim to reflect the exact date that they were to be placed up for auction sale.

23.     As part of the auction process, in addition to the vehicles themselves, EMG would also send to Manheim, in advance of each Run Week date, titling instruments for said vehicles (the "Title Forms") along with a certain Maryland state re-assignment form (collectively, the "Re-Assignment Forms" and each a "Re-Assignment Form") for each vehicle title form.   These packages were sent to "Manheim Auto Auction" to the attention of "Title Department Maz Co."

24.     The Re-Assignment Forms were pre-signed by EMG as assignor and indicated that Maz Company would become the assignee.   However, in view of EMG's continued ownership of the vehicles until circumstances that would lead to immediate payment of the net

11328642_13

proceeds to EMG, the Re-Assignment Forms left the following sections either blank or not fully completed: the date of sale, the sale price and the odometer reading.

25.     After receiving the Title Forms and Re-Assignment Forms, Manheim, and specifically employees at Manheim (including Manchester), in recognition of the fact that EMG still maintained ownership of the vehicles at that time, maintained custody of these documents pending sale of the vehicle through the Manheim Auction House process under circumstances that would lead to immediate payment of the net proceeds to EMG.

26.     If and only if one of the vehicles was sold by Maz Company and Nader, through the Manheim Auction House, under circumstances that would lead to immediate payment of the net proceeds to EMG, Manheim, and specifically employees at Manheim (including Manchester), would then become authorized to complete the blank sections of the Re-Assignment Form, to wit – the date of sale, the sale price and odometer reading, as this was an integral part of the auction process and necessary to transfer title to the auction purchaser.  In circumstances where a notary was required, Manheim would then become authorized to notarize the Re-Assignment Form and/or any necessary assignments of title.   An exemplar copy of one of the Re-Assignment Forms is attached hereto as Exhibit "A."

27.     Once EMG received notice that a particular vehicle had been sold through the Manheim Auction House, EMG would then generate an Invoice reflecting the sales price and that the car had been sold to Maz Company for a sales price equal to the price of the vehicle sold at auction.

28.     If, however, a particular vehicle or vehicles had not been sold on the designated Run Week, the Re-Assignment Forms were not authorized to be completed by Manheim and the above-referenced sections on each remained blank while Manheim remained in possession of the

6

Re-Assignment Form(s) and Title Form(s).   Again, the non-completion of these forms by Manheim was in recognition of the fact that EMG was still the owner of said vehicles unless and until the vehicles were sold through the Manheim Auction House under circumstances that would lead to the immediate payment of the net proceeds to EMG.

29.   Vehicles that did not sell on the original Run Week would either be relisted for a subsequent Run Week or, in certain circumstances, would be pulled from the Manheim Auction House and sent back to EMG.  In the latter scenario, Manheim would also return back to EMG, the relevant Title Form(s) and Re-Assignment Form(s).  Because these vehicles had not been sold, the Re-Assignment Forms would be returned to EMG in their original form, with certain sections remaining blank, as described above.

30.   The above-described practice – of sending Manheim the Title Forms and partially completed Re-Assignment Forms – for vehicles that EMG still owned, was a standard practice authorized and/or permitted by Manheim.

## AUDITING OF CARS – HOW IT WAS SUPPOSED TO WORK

31.   EMG's floor plan agreement with MBFS provided MBFS with the right to audit EMG's floor plan inventory on a regular basis.  Lenders conduct floor plan audits to verify that every vehicle that the lender is currently financing for a dealer is and remains actually present in the dealer's inventory, because the terms of their loans require repayment of the amount loaned on each vehicle to be repaid as soon as the vehicle is sold by the dealer.  Since at least 2010, MBFS has outsourced its vehicle auditing responsibilities to DataScan Technologies, LLC ("DataScan").  DataScan, acting on behalf of MBFS, conducted quarterly audits of EMG's floor plan inventory.  Those audits occurred at EMG's Germantown, Maryland facility, with DataScan auditors working hand in hand with EMG employees.

7

11328642_13

32.    When each audit was completed, DataScan would document and present its findings in the form of an audit report to EMG for signoff.  Thereafter, the quarterly audit report of EMG's floor plan inventory was sent to MBFS.  The audit report presents a summary verification that the vehicles floor planned by EMG through MBFS, had not been sold and remained in EMG's inventory at EMG's dealership and storage lot in Germantown, at the Manheim Auction House, or at any other location specified in the audit, as of the audit date.

33.    At all relevant times, EMG believed that the vehicles DataScan was verifying through Manheim employees were physically present at the Manheim Auction House and, as reflected by the quarterly audit reports provided to EMG, had not yet been sold.  Therefore, EMG did not pay MBFS for any of the vehicles that DataScan verified as being present at the Manheim Auction House.

34.    EMG relied on DataScan's quarterly audits to make certain important business decisions, including, the re-occurring decision to continue to entrust Maz Company and Nader with additional EMG wholesale vehicle inventory for sale through the Manheim Auction House; the re-occurring decision to continue sending EMG vehicles, Title Forms and Re-Assignment Forms to the Manheim Auction House; the re-occurring decision to continue to buy and sell vehicles through the Manheim Auction House; and engaging in business generally with Manheim, Maz Company and Nader.

35.    At all relevant times, DataScan's routine and regular method of verifying EMG's floor plan inventory located at the Manheim Auction House during the course of a quarterly audit, was to call the general number for the Manheim Auction House and ask to speak to the title department and/or a title clerk.  The call would then be routed by the Manheim telephone operator to one of Manheim's title clerk employees pursuant to a process authorized or

8

established by Manheim and/or its employees.

36.     Upon information and belief, the DataScan auditor would identify himself/herself and state the purpose of the call.  He or she would then proceed vehicle-by-vehicle to verify with the Manheim employee that the vehicle in question was physically present at the Manheim Auction House.

37.     The DataScan auditor would also verify with the Manheim employee the next intended "Run Week" for each vehicle.

38.     The DataScan auditor would also verify with the Manheim employee that the Title Form for each vehicle in question was also physically present at the Manheim Auction House, and would confirm the presence of each such Title Form by recording the phrase "MSO" in the audit report for each corresponding vehicle.

39.     Finally, the DataScan auditor would identify the particular Manheim employee that verified the above-referenced information for each vehicle during each audit and create a written audit report.

40.     Quarterly audits began in 2007 or earlier and continued through April of 2013. EMG presently lacks information to determine whether the true status of its wholesale inventory during the period 2007 through the first part of 2010 was misrepresented by Manheim and, if so, by whom.

41.     In 2010, the Manheim employee verifying EMG's floor plan inventory to the DataScan auditor was an individual identified on DataScan's audit report as Michael Nicoletti ("Nicoletti").

42.     Beginning in 2011 and continuing through 2013, DataScan's audits revealed that the Manheim employee verifying EMG's floor plan inventory to the DataScan auditor was

Manchester.

43.    Prior to April 18, 2013, all vehicles that were reflected in EMG's and MBFS's records as not sold and physically present at the Manheim Auction House, were verified and represented to EMG, DataScan and MBFS as such by Manheim employees.

## THE FRAUD IS DISCOVERED AND THE AFTERMATH

44.    On April 18, 2013, DataScan performed a regular quarterly audit of EMG's dealer floor plan inventory, including its process of verifying the physical presence of all of EMG's floor planned vehicles and titles at the Manheim Auction House (the "April 18th audit").

45.    The April 18th audit revealed a significant discrepancy between EMG's and MBFS's internal inventory count of dealer floor plan vehicles at the Manheim Auction House, versus the actual inventory of EMG floor planned vehicles at Manheim as established by the April 18th audit.  More particularly, the April 18th audit revealed that 129 vehicles had been sold without proper reporting and remittance of the net proceeds to EMG.

46.    In all instances, the discrepancies between EMG's and MBFS's internal inventory count and the actual inventory count as shown by the April 18th audit was caused by vehicles that EMG believed were being held at the Manheim Auction House in preparation for auction sale, but were, in fact, already sold but not reported as such.

47.    As in previous audits, the April 18th audit began with a call from the DataScan auditor to the general number at the Manheim Auction House, eventually being routed to a Manheim title clerk employee.

48.    On this call, a Manheim employee – identified in the April 18th letter audit report as "Vicky" and/or "Zach" – disclosed, for the first time, that a large number of the floor planned vehicles on the audit list were not physically present at Manheim, and had, in fact, been

10

previously sold through the Manheim Auction House by Maz Company and Nader.

49.    A number of these vehicles had been sold months prior to the April 18th audit date, without reporting and remittance of the net sales proceeds back to EMG per the agreement of the parties.

50.    Further inquiry by EMG into reporting for prior audits revealed that a number of prior DataScan audits were inherently inaccurate because they contained misrepresentations of material fact from Manheim's employees, and particularly Nicoletti and Manchester, regarding the true status of EMG's floor planned inventory.

51.    EMG's inquiry consisted of a review and test sampling of randomly selected lots of auctioned cars from quarterly floor plan audits occurring between July of 2010 and April of 2013. Manheim initially assisted in this inquiry by providing EMG with sales data for cars sold at the Manheim Auction House during this approximate three year time period.

52.    The results of the inquiry showed that Nicoletti (on one occasion) and Manchester (on repeated occasions) lied about at least the following facts during the previous three years of DataScan audits: whether EMG's inventory was physically present at the Manheim Auction House (thus indicating that the vehicle had <u>not</u> been sold as of the audit date when in fact it had been sold); whether the Title Form for certain of the vehicles was physically present at the Manheim Auction House; and in the case of Manchester, the date of the Run Week for certain of the vehicles. The initial test samplings demonstrated that these misrepresentations were made with respect to 51 of 77 vehicles identified during the January 9, 2013 audit; 7 of 10 vehicles sampled with respect to the October 5, 2012 audit; 7 of 10 vehicles sampled with respect to the July 23, 2012 audit; 14 of 20 vehicles sampled with respect to the January 12, 2012 audit; 16 of 20 vehicles sampled with respect to the January 10, 2011 audit; and 8 of 20 vehicles sampled

with respect to the July 22, 2010 audit.  Further samplings revealed that the above-described misrepresentations of fact were made with respect to 54 additional vehicles involved in the October 5, 2012, the January 12, 2012 and the January 10, 2011 audits. Nicoletti and Manchester made these misrepresentations within their scope of their authority, through a process established by Manheim, and with the support and cooperation of Manheim and/or its other employees.

53.     Although EMG desired to conduct additional inquiry into the prior audits and reporting, without Manheim's further cooperation, it lacked the necessary information to do so. Accordingly, it is not clear precisely when the fraud began; however, based on the limited information that has been already provided by Manheim, EMG believes that the fraud was in existence at least as of July of 2010 and continued up to April of 2013.

54.     EMG's limited inquiry through test sampling of randomly selected lots of auction cars revealed that Manheim, through its employees, had misrepresented the physical presence of 157 out of the 211 vehicles EMG was able to sample (which represents a misrepresentation ratio of seventy-four percent (74%) on the sampled vehicles), going back as far as July 22, 2010. These misrepresentations of material facts were made with respect to each specific vehicle on at least one occasion, and, in some cases, on multiple occasions.  EMG sold in excess of 5500 vehicles through the Manheim Auction House from 2007 through April 18, 2013.  Upon information and belief, extrapolating this percentage to the increasing volume of EMG vehicles wholesaled at Manheim during the period means similar misrepresentations were likely made by Manheim employees involving thousands of vehicles and many millions of dollars of proceeds from vehicle sales.  Further inquiry will be needed to determine whether such misrepresentations go back to 2007 when the parties' relationship began.

55.     After the April 18th audit and the discovery of the fraud, which allowed EMG to

put an end to the continuing cycle of misrepresentations and delayed reporting of sales, EMG determined that it had not been paid for 53 MBFS floor planned vehicles (totaling $1,772,804.00) that had been previously sold through the Manheim Auction House sold without being reported and without remittance of net sales proceeds to EMG; and also had not been paid for 76 additional vehicles purchased with EMG's funds (totaling $2,102,291.00), that had been previously sold through the Manheim Auction House without being reported and without remittance of net sales proceeds to EMG.  Prior to April 18, 2013, the fact that these vehicles had been sold without being reported, and that, on a continuous and revolving basis, vehicles before these had been regularly sold without being timely reported as sold, had not been disclosed to EMG by Manheim, Maz Company, Nader or anyone else.

56.    The true sales dates for the already sold MBFS floor planned vehicles demonstrated that EMG's obligated repayment to MBFS on the floor plan loan for each of the sold floor planned vehicles was overdue and delinquent.  At that point in time, EMG's "out of trust" position equaled the sum of the loan on the already sold cars – *i.e.* $1,772,804.00.  As such, during the week of April 22, 2013, EMG paid MBFS $1,772,804.00 as required by its floor plan agreement.

57.    Manchester worked closely with Nader and Maz Company in the sale of EMG's inventory through the Manheim Auction House in Maz Company's dedicated lane.

58.    Specifically, upon information and belief, Manheim assigned Manchester to provide dedicated and/or exclusive title clerk and other services to Maz Company and Nader for vehicles sold through the Manheim Auction House.

59.    Manheim also provided Maz Company and Nader with private office space at the Manheim Auction House and Manheim employees, including Manchester, were assigned by

13

Manheim to desks located within this office space.

60.    Manheim, Nicoletti and Manchester acted in concert with Nader.

61.    Manheim facilitated and was aware of the process whereby DataScan auditors were referred to Nicoletti and Manchester for purposes of providing alleged independent verification of EMG's floor plan inventory located at the Manheim Auction House.

## MANHEIM ADMITS TO PARTICIPATING IN THE FRAUD, THEN BACKTRACKS

62.    When confronted with the factual background regarding the material false representations made by Manheim employees, Manheim's General Manager Tim Van Dam ("Van Dam") admitted to EMG's Chief Financial Officer Duke Mercer  ("Mercer") on May 1, 2013, that Manchester was doing the bidding of Nader in falsely representing to DataScan and EMG, that the subject vehicles were physically present at the Manheim Auction House when in fact they had already been sold and the proceeds had been pocketed by Maz.

63.    Specifically, Van Dam admitted that Manchester made the materially false statements to DataScan about the previously sold vehicles still being at the Manheim Auction House because "Nader told her to say that."  During this conversation, Van Dam assured Mercer that Manheim would thoroughly investigate this matter because "integrity means everything to Manheim."

64.    Notwithstanding Van Dam's original admission, during a subsequent telephone conversation with Mercer on May 20, 2013, Van Dam's position on Manchester's statements and actions shifted drastically.  Instead of acknowledging Manchester's wrongdoing, as he had done on May 1st, Van Dam maintained that Manchester had done nothing wrong, that DataScan had continually asked the wrong question, and that Manchester merely answered the specific erroneous question that was asked by DataScan.  For the reasons stated herein, EMG vigorously

14

disputes Van Dam's revised statements and characterizations.  In conjunction with this change of position, Manheim also made it clear that it would no longer cooperate with EMG's inquiries.

## COUNT ONE — INTENTIONAL MISREPRESENTATION/FRAUD

### (MANHEIM AUCTIONS, INC. AND VICKIE MANCHESTER)

65.     EMG incorporates the foregoing paragraphs by reference as though set forth herein.

66.     EMG believes that the fraud at issue involved thousands of vehicles, failure to properly report many millions of dollars of vehicles sales, and many times that number of individual misrepresentations as part of a continuing fraudulent scheme.   Based upon the limited samplings conducted to date, EMG can demonstrate that beginning in at least in July of 2010 (and possibly going back to as early as 2007), representatives and employees of Manheim, and in particular Nicoletti and Manchester, made hundreds of affirmative misrepresentations of material facts to DataScan, EMG and MBFS, during DataScan's quarterly audits of EMG's floor plan inventory, including: that certain substantial portions of EMG's inventory was physically present at the Manheim Auction House when in fact it was not; the date of the next intended Run Week for each of these vehicles that had been previously sold without proper notice and remittance of sales proceeds back to EMG; and that the Title documentation for each of these vehicles was physically present at the Manheim Auction House when in fact it was not.  Using the limited information in its possession, EMG has compiled a list of 157 vehicles for which these various misrepresentations were made, the date of the misrepresentations and the name of the Manheim employee making said misrepresentations, attached it hereto and incorporates it herein as Exhibit "B".

67.     Specifically, and as identified in Exhibit B hereto, Nicoletti and/or Manchester

routinely and falsely represented that EMG vehicles were at the Manheim Auction House; that the vehicles were set for potential auction sale on a subsequent Run Week, and that Manheim currently possessed the Title documentation for each such vehicle when in fact these very same vehicles had already been sold through the Manheim Auction House prior to the time of these false representations. These material misrepresentations of fact were made knowingly and intentionally, as Manheim maintained records showing the sales date of each vehicle and whether the vehicle was still physically present at the Manheim Auction House.

68.    These continuing misrepresentations were made over the course of the 3 partially sampled years with the intent, and in furtherance of a scheme, to continually withhold reporting to EMG of vehicle auction sales in order to retain sale proceeds belonging to EMG.

69.    Manheim is vicariously liable for the aforementioned acts of Nicoletti and Manchester because they were made during their scope of employment as representatives and employees of Manheim, through a process that Manheim authorized, justified, created and/or participated in.

70.    Manheim is also vicariously liable for the aforementioned acts of Nicoletti and Manchester as they were acting at all times within the scope of their employment with Manheim when communicating with the auditors from DataScan through a process that was established, authorized and/or facilitated by Manheim and/or its employees.

71.    Whether EMG's inventory was physically present at the Manheim Auction House; the accurate date of the Run Week for each of these vehicles; and whether the Title documentation was physically present at the Manheim Auction House, were all material statements within the context of an audit conducted with respect to EMG's floor plan vehicles, as these statements would demonstrate the true sales date and status of the vehicles, EMG's right to

receive payment of the net proceeds, and its obligation to make payment to MBFS pursuant to its floor plan agreement.

72.    Nicoletti and Manchester either knew that these representations were false when made, or they made these misrepresentations of material fact with reckless disregard of their falsity.

73.    At all times relevant, the means of obtaining accurate answers to the questions posed by DataScan were not equal, and Manheim, Nicoletti and Manchester all possessed superior information to respond to DataScan's audit questions.

74.    The false statements made by Nicoletti and Manchester to DataScan were made with the specific intent of misleading EMG into relying on them and these misrepresentations were made with the specific intent of causing EMG to act based on the misrepresentations, by continuing to entrust Manheim, Maz Company and Nader with its wholesale vehicle inventory for auction sale through the Manheim Auction House, and thereby increasing revenue to Manheim.

75.    At all times relevant, Manheim, Nicoletti and Manchester each failed to act in good faith toward EMG, as each of them engaged in secretive and collusive conduct with Maz Company and Nader, all as more particularly described above.  Specifically, Manheim, Nicoletti and Manchester each knew that the conduct of Maz Company and Nader in failing to accurately report the true sales status of said vehicles was not sanctioned or authorized by EMG.

76.    This deception was successful as EMG reasonably and justifiably relied on the DataScan audits and the material misrepresentations of fact set forth above, and continued to entrust Manheim, Maz Company and Nader with its wholesale vehicle inventory for sale through the Manheim Auction House.  The DataScan audits confirmed EMG's internal inventory log

17

with Manheim's supposed independent personnel, and constituted reasonable verification of its inventory at Manheim.

77.     Had Nicoletti and Manchester not falsely represented the true sales status of EMG's inventory at Manheim, EMG would have discovered the Ponzi scheme orchestrated by Maz Company and Nader, and thereby would have avoided the entirety of its present loss.

78.     Although EMG believes that the fraud involved thousands of vehicles and misrepresentations and millions of dollars of vehicle sales proceeds, as a direct and proximate result of EMG's justifiable reliance on the aforementioned intentional misrepresentations, EMG has suffered damages in excess of $3,800,000.00, which represents the value of the sales proceeds of EMG's wholesale vehicle inventory sold through the Manheim Auction House without proper reporting and remittance of the net sales proceeds back to EMG as of the time the fraud was discovered.  (A true and correct copy of the complete list of these 129 missing vehicles, which are the basis of EMG's compensatory damages, is attached hereto and incorporated herein as Exhibit "C".)

79.     The conduct of Manheim, Nicoletti and Manchester was outrageous, malicious, wanton, willful, oppressive, or done with a reckless indifference to the rights of EMG.

WHEREFORE, Plaintiff Euro Motorcars Germantown, Inc. hereby demands judgment in its favor and against Manheim Auctions, Inc., and Vickie Manchester, jointly and severally, for the following relief:

a.     compensatory damages in excess of $75,000.00;

b.     punitive damages;

c.     prejudgment interest thereon;

d.     costs; and

e.     for such other and further relief that the Court deems equitable and just

18

under the circumstances.

## COUNT TWO — NEGLIGENT MISREPRESENTATION

### (MANHEIM AUCTIONS, INC. AND VICKIE MANCHESTER)

80.     EMG incorporates the foregoing paragraphs by reference as though set forth herein.

81.     EMG believes that the fraud involved thousands of vehicles, many more times of particular misrepresentations, and millions of dollars of vehicle sale proceeds.  However, based upon the limited samplings conducted to date, beginning at least in July of 2010 and possibly well beforehand, representatives and employees of Manheim, and in particular Nicoletti and Manchester, made numerous affirmative misrepresentations to DataScan during DataScan's quarterly audits of EMG's inventory, including: whether EMG's inventory was physically present at the Manheim Auction House; whether the Title documentation was physically present at the Manheim Auction House; and in the case of Manchester, the date of the next intended Run Week for each of these vehicles that had been previously sold without proper notice and/or remittance of sales proceeds back to EMG.

82.     Specifically, Nicoletti and/or Manchester falsely represented that EMG vehicles were physically present at the auction, that the vehicles were set for potential auction on a subsequent Run Week, and that Manheim currently possessed the Title documentation for each such vehicle when these very same vehicles had, in fact, been sold and delivered to subsequent purchasers prior to the time the false representations were made.

83.     Manheim is vicariously liable for the aforementioned acts of Nicoletti and Manchester because, upon information and belief, Manheim authorized, justified, participated in, and/or knew through its employees of these misrepresentations as they were being made by its

19

representatives and employees.

84.     Manheim is also vicariously liable for the aforementioned acts of Nicoletti and Manchester as they were acting at all times within the scope of their employment with Manheim when communicating with the auditors from DataScan pursuant to a process established, authorized and/or facilitated by Manheim and/or it employees.

85.     Whether EMG's inventory was physically present at the Manheim Auction House; the accurate date of the Run Week for each of those vehicles; and whether the Title documentation was physically present at the Manheim Auction House, were all material statements within the context of each audit of EMG's floor plan inventory at Manheim, as those statements would demonstrate the true sales status of the vehicle, EMG's right to receive payment on the vehicle, and its obligation to make payment to MBFS pursuant to its floor plan agreement.

86.     The false representations uttered by Nicoletti and Manchester were made under circumstances in which they knew or should have known of their falsity.

87.     At all times relevant, the means of obtaining accurate answers to the questions posed by DataScan were not equal, and Manheim, Nicoletti and Manchester all possessed superior information to respond to DataScan's audit questions.

88.     The false statements made by Nicoletti and Manchester to DataScan were made with the specific intent of misleading EMG and causing it to rely upon them.  They were also made with the specific intent of causing EMG to act based on the misrepresentations by continuing to entrust Manheim, Maz Company and Nader with its wholesale vehicle inventory to be sold through the Manheim Auction House, thereby increasing revenues to Manheim.

89.     The false information provided by Manheim through Nicoletti and Manchester

was given in the course of their business, profession and employment at Manheim, for the guidance of EMG in its business transactions with Manheim, Maz Company and Nader. Manheim had a pecuniary interest in falsely representing the true sales status of the vehicles as doing so ensured that EMG would continue to entrust Manheim, Maz Company and Nader with its wholesale vehicle inventory to be sold through the Manheim Auction House, thereby increasing revenues to Manheim.

90.    At all times relevant, Manheim, Nicoletti and Manchester each failed to act in good faith with EMG, as each of them engaged in secretive and collusive conduct with Maz Company and Nader, all as more particularly described above.  Specifically, Manheim, Nicoletti and Manchester each knew that the conduct of Maz Company and Nader in failing to accurately report each sale and to remit the net proceeds to EMG, was not sanctioned by EMG.

91.    This deception was successful as EMG reasonably and justifiably relied on the misrepresentations and the DataScan audits, and continued to entrust Manheim, Maz Company and Nader with its wholesale vehicle inventory for sale through the Manheim Auction House. The DataScan audits confirmed EMG's and MBFS's internal inventory log and constituted reasonable independent verification of EMG's inventory at Manheim.

92.    Had Nicoletti and Manchester not falsely represented the true sales status of EMG's vehicle inventory during the quarterly audits, EMG would have discovered the Ponzi scheme orchestrated by Maz Company and Nader, and thereby would have avoided the entirety of its present loss.

93.    As a direct and proximate result of EMG's justifiable reliance on the aforementioned misrepresentations, EMG has suffered damages in excess of $3,800,000.00, with respect to the vehicles identified in Exhibit "C" hereto.

11328642_13

94.     The conduct of Manheim, Nicoletti and Manchester was outrageous, malicious, wanton, willful, oppressive, or done with a reckless indifference to the rights of EMG.

WHEREFORE, Plaintiff Euro Motorcars Germantown, Inc. hereby demands judgment in its favor and against Manheim Auctions, Inc. and Vickie Manchester, jointly and severally, for the following relief:

      a.     compensatory damages in excess of $75,000.00;

      b.     punitive damages;

      c.     prejudgment interest thereon;

      d.     costs; and

      e.     for such other and further relief that the Court deems equitable and just under the circumstances.

## COUNT THREE — INTENTIONAL NON-DISCLOSURE
### (MANHEIM AUCTIONS, INC. AND VICKIE MANCHESTER)

95.     EMG incorporates the foregoing paragraphs by reference as though set forth herein.

96.     EMG believes that the fraud involved thousands of vehicles, many more times of particular misrepresentations and/or non-disclosures involving millions of dollars of vehicle sales proceeds.  Based solely upon the limited samplings conducted to date, beginning at least in July of 2010 and possibly well beforehand, representatives and employees of Manheim, and in particular Nicoletti and Manchester, intentionally concealed the fact that over 150 of EMG's vehicles being audited from time to time by DataScan had previously been sold through the Manheim Auction House prior to the date of each audit.  (See Exhibit "B" attached hereto.)

97.     Specifically, Nicoletti and/or Manchester intentionally concealed the facts that the audited vehicles were no longer physically present at the Manheim Auction House, that the

vehicles had already been auctioned and sold on a previous Run Week, and that the Title documentation and other documents for each such vehicle had been transferred to the purchaser of each such vehicle prior to the audit.

98.     These continuing misrepresentations were made over the course of approximately three years and possibly well beforehand, with the intent, and in furtherance of a scheme, not to accurately report vehicle auction sales to EMG.

99.     Manheim is vicariously liable for the aforementioned acts of facts by Nicoletti and Manchester because, upon information and belief, Manheim authorized, justified, participated in, and/or knew through its employees of this continuing intentional concealment of material facts.

100.     Manheim is also vicariously liable for the aforementioned acts of Nicoletti and Manchester as they were acting at all times within the scope of their employment with Manheim.

101.     Whether EMG's vehicle inventory was physically present at the Manheim Auction House; the accurate date of the Run Week for each of those vehicles; and whether the Title documentation was physically present at the Manheim Auction House were all material statements of fact within the context of this case, as those statements would demonstrate the true sales status of these vehicles, EMG's right to receive payment on these vehicles and EMG's obligation to make payment to MBFS pursuant to its floor plan agreement.

102.     The concealment of these facts by Nicoletti and Manchester was intentional and knowing.   Alternatively, the concealment was undertaken by Nicoletti and Manchester with reckless disregard of their duties to EMG.

103.     At all times relevant, the means of obtaining accurate answers to the questions posed by DataScan were not equal, and Manheim, Nicoletti and Manchester all possessed

23

superior information to respond to DataScan's audit questions.

104.    EMG entrusted its valuable wholesale vehicle inventory to Manheim, Nicoletti and Manchester for auction sale at the Manheim Auction House.  Manheim, Nicoletti and Manchester accepted responsibility for this inventory thereby creating a duty to truthfully and completely account to EMG and anyone acting in its interest with respect to the sales of EMG's used vehicle inventory and the sale proceeds generated therefrom.

105.    Moreover, Manheim, Nicoletti and Manchester each had a duty to speak because they all occupied a relation of trust and confidence vis-à-vis EMG.

106.    Specifically, EMG relied on the representations given by Manheim, Nicoletti and Manchester as more particularly explained above and, at the time they were made, Manheim and Manchester's representations to DataScan constituted the only source of information related to the physical presence of EMG's vehicle inventory at the Manheim Auction House; and/or the issues related to EMG's wholesale vehicle inventory were not discoverable by other reasonable means, as audits by DataScan were the reasonable and accepted methods for verifying the physical presence of vehicles at the Manheim Auction House.

107.    Manheim, Nicoletti and Manchester each also had a duty to speak because disclosure of the true facts related to the previously sold and missing EMG inventory was necessary to prevent an ambiguous or partial statement from being misleading.  That is, in verifying the audited cars with DataScan, Manheim, Nicoletti and Manchester, at best, provided DataScan with ambiguous and incomplete information related to EMG's vehicle inventory at the Manheim Auction House.

108.    Finally, Manheim, Nicoletti and Manchester each had a duty to speak because the undisclosed facts that EMG's vehicle inventory had been sold and was not physically present at

24

the Manheim Auction House as of the audit dates, were facts that were basic to the business transactions between EMG and Manheim.

109.    The intentional concealments by Nicoletti and Manchester were undertaken with the specific intent of misleading EMG into believing that the audited vehicles were still present at the Manheim Auction House awaiting auction sale as of the date of each audit and those concealments were undertaken with the specific intent of causing EMG to act based on this misconception by continuing to entrust Manheim, Maz Company and Nader with its used vehicle inventory for sale through the Manheim Auction House, thereby increasing revenues to Manheim.

110.    At all times relevant, Manheim, Nicoletti and Manchester each failed to act in good faith with EMG, as each of them engaged in secretive and collusive conduct with Maz Company and Nader, all as more particularly described above.  Specifically, Manheim, Nicoletti and Manchester each knew that the conduct of Maz Company and Nader in selling vehicles and failing to remit the net sales proceeds back to EMG was not authorized or sanctioned by EMG.

111.    This deception was successful as EMG, DataScan and MBFS each reasonably and justifiably relied on the misrepresentations and concealed facts and EMG continued to entrust Manheim, Maz Company and Nader with its wholesale vehicle inventory for sale through the Manheim Auction House.  The DataScan audits confirmed EMG's internal wholesale vehicle inventory log and constituted reasonably independent verification of EMG's wholesale inventory at Manheim.

112.    Had Nicoletti and Manchester not intentionally concealed the true sales status of EMG's used vehicle inventory, and accurately reported the true sales status of the vehicles on each quarterly audit call, EMG would have discovered the Ponzi scheme orchestrated by Maz

Company and Nader, and thereby would have avoided the entirety of its present loss.

113.    As a direct and proximate result of EMG's justifiable reliance on the aforementioned intentional concealments, EMG has suffered damages in excess of $3,800,000.00.

114.    The conduct of Manheim, Nicoletti and Manchester was outrageous, malicious, wanton, willful, oppressive, or done with a reckless indifference to the rights of EMG.

WHEREFORE, Plaintiff Euro Motorcars Germantown, Inc. hereby demands judgment in its favor and against Manheim Auctions, Inc. and Vickie Manchester, jointly and severally, for the following relief:

    a.    compensatory damages in excess of $75,000.00;

    b.    punitive damages;

    c.    prejudgment interest thereon;

    d.    costs; and

    e.    for such other and further relief that the Court deems equitable and just under the circumstances.

## COUNT FOUR — CONVERSION

### (MANHEIM AUCTIONS, INC. AND VICKIE MANCHESTER)

115.    EMG incorporates the foregoing paragraphs by reference as though set forth herein.

116.    As more particularly described above, Manheim, Nicoletti and Manchester interfered, without lawful justification, with EMG's use, possession and right of property in two particular assets – the used vehicle inventory at the Manheim Auction House and the sales proceeds therefrom.  EMG believes that this interference involved thousands of vehicles, many times more of particular misrepresentations, and millions of dollars of vehicle sales proceeds.

26

Based solely on the limited sampling EMG was provided and the determination of its loss as of when the fraud was discovered, Manheim, Nicoletti and Manchester specifically interfered with EMG's rights in the following vehicles entrusted to them: 53 floor planned vehicles (totaling $1,772,804.00) and 76 vehicles purchased with EMG's funds (totaling $2,102,291.00), all of which had been previously sold by Maz Company and Nader through the Manheim Auction House without timely reporting and payment of the sales proceeds to EMG prior to April 18th Audit (collectively, the "Stolen Cars"). These sums represent the loss to EMG based upon the market value proceeds of the Stolen Cars at the time and place of their conversion at the Manheim Auction House (the "Proceeds"). (See Exhibit "C" for complete list of vehicles.)

117.    As more particularly described above, Manheim, Nicoletti and Manchester received EMG vehicles, Re-Assignment Forms and Title Forms with the explicit knowledge and understanding that EMG remained the owner of all such property unless and until a sale occurred and the proceeds were paid over to EMG. Further, Manheim, Nicoletti and Manchester each knew and understood that the authorization given them by EMG to book sales and complete the Re-Assignment Forms was only applicable in the event of circumstances that would lead to immediate payment of the net sales proceeds to EMG.

118.    Accordingly, Manheim, Nicoletti and Manchester knew and understood that the Stolen Cars remained the property of and were owned by EMG unless and until they were sold through the Manheim Auction House in circumstances that would lead to immediate payment of the net sales proceeds to EMG.

119.    Thus, EMG had an immediate right to possess the Stolen Cars and the Proceeds generated therefrom by virtue of the fact that EMG was still the record owner of the vehicles prior to the conversion of same by Manheim, Nicoletti and Manchester.

120.    Manheim, Nicoletti and Manchester committed conversion by intentionally disposing the lawful possessor, EMG, of the Stolen Cars and the Proceeds through the fraudulent scheme of misrepresenting the true sales status of vehicles supposedly maintained at the Manheim Auction House.

121.    Manheim, Nicoletti and Manchester had possession of the Stolen Cars and their Title Forms immediately before converting the same and then turning the vehicles over to subsequent auction purchasers knowing that, due to their continuing fraud, circumstances did not then exist that would lead to the immediate payment of net sales proceeds to EMG.

122.    Manheim, Nicoletti and Manchester had possession of the Proceeds immediately before converting the same and then turning over the proceeds to Maz Company and Nader.

123.    EMG did not consent to the above-described interference by Manheim, Nicoletti and Manchester with EMG's property.

124.    Manheim, Nicoletti and Manchester acted without lawful justification when they interfered with EMG's aforementioned property.

125.    EMG has suffered damages as a result of the interference by Manheim, Nicoletti and Manchester, the value of which as of the date hereof is in excess of $3,800,000.00, excluding court costs and interest.

126.    The conduct of Manheim, Nicoletti and Manchester was outrageous, malicious, wanton, willful, oppressive, or done with a reckless indifference to the rights of EMG.

WHEREFORE, Plaintiff Euro Motorcars Germantown, Inc. hereby demands judgment in its favor and against Manheim Auctions, Inc. and Vickie Manchester, jointly and severally, for the following relief:

      a.      compensatory damages in excess of $75,000.00;

      b.      punitive damages;

     c.     prejudgment interest thereon;

     d.     costs; and

     e.     for such other and further relief that the Court deems equitable and just under the circumstances.

## COUNT FIVE — QUASI CONTRACT / UNJUST ENRICHMENT

## (MANHEIM AUCTIONS, INC.)

127.    EMG incorporates the foregoing paragraphs by reference as though set forth herein.

128.    EMG has bought or sold in excess of 5500 vehicles through the Manheim Auction House since 2007.

129.    EMG conferred benefits on Manheim by buying and selling vehicles and entrusting its wholesale vehicles, Title Forms and Re-Assignment Forms to Manheim for sale through the Manheim Auction House.

130.    EMG further conferred benefits on Manheim at the time each of the Stolen Cars was sold through the Manheim Auction House by virtue of Manheim's receipt of fees associated with each sale, including the buy, sell and run fees.  EMG believes that these fees approximate $850 per vehicle.

131.    EMG conferred further benefits on Manheim by purchasing certain used vehicles through the Manheim Auction House auction sales, with Manheim receiving fees associated with each such purchase, including the buy, sell and run fees.  EMG believes that these fees approximate $850 per vehicle.

132.    Manheim received, benefitted from and appreciated these benefits.

133.    Given the pervasive and wide-ranging fraud, acts and omissions described above, Manheim's acceptance and retention of these benefits under such circumstances without paying

their value would be inequitable.

134.   As a result of its wrongful acts and omissions, Manheim was unjustly enriched by an amount in excess of $4,675,000.00 (5500 vehicles x $850 in fees per vehicle).

WHEREFORE, Plaintiff Euro Motorcars Germantown, Inc. hereby demands judgment in its favor and against Manheim Auctions, Inc. for the following relief:

a.   damages in excess of $75,000.00;

b.   prejudgment interest thereon;

c.   costs; and

d.   for such other and further relief that the Court deems equitable and just under the circumstances.

## COUNT SIX — INTENTIONAL MISREPRESENTATION/FRAUD

### (MAZ COMPANY AND NADER AMIRKABIRIAN)

135.   EMG incorporates the foregoing paragraphs by reference as though set forth herein.

136.   Maz Company and Nader made a number of misrepresentations of fact regarding the status of the Stolen Vehicles.  Specifically, beginning at least in July of 2010 and possibly well beforehand and continuing through late 2012 and early 2013, while reviewing outstanding inventory with representatives of EMG, Nader falsely represented that vehicles were at the Manheim Auction House pending auction sale, when in fact these very same vehicles had been sold through the Manheim Auction House prior to the time the false representations were made. (See specific vehicles identified in Exhibits B and C attached hereto and incorporated herein.)

137.   Maz Company is vicariously liable for the aforementioned acts of Nader because Nader was the owner and sole proprietor of Maz Company at all relevant times, and, because Maz Company, acting through Nader, authorized, justified, participated in, and/or knew of these

misrepresentations as they were being made.

138.   Maz Company is also vicariously liable for the aforementioned acts of Nader as he was acting at all times within the scope of his employment with Maz Company when communicating and dealing with EMG.

139.   Nader's misrepresentations regarding the true sales status of EMG's used vehicles were material because of EMG's right to receive payment and its obligation to make timely payment to MBFS with respect to the floor plan loan upon the sale of each vehicle.

140.   Nader knew that these representations were false when made, or, alternatively, he made these misrepresentations with reckless disregard for their falsity.

141.   At all times relevant, the means of obtaining accurate answers to the questions posed by EMG were not equal, and Nader and Maz Company both possessed superior information to respond to EMG's inventory inquires.

142.   The false statements made by Nader to EMG were made with the specific intent of misleading EMG and causing EMG to rely upon them.  These misrepresentations were also made with the specific intent of causing EMG to act based upon the misrepresentations, by continuing to entrust Manheim, Maz Company and Nader with its wholesale vehicle inventory for sale through the Manheim Auction House, and thereby increasing revenues and commissions for Maz Company and Nader.

143.   This deception was successful as EMG reasonably and justifiably relied on Nader's misrepresentations and continued to entrust Manheim, Maz Company and Nader with its wholesale vehicle inventory for sale through the Manheim Auction House.

144.   Had Nader not falsely represented the true sales status of EMG's wholesale vehicle inventory, EMG would have discovered the Ponzi scheme orchestrated by Maz Company

and Nader, and thereby would have avoided the entirety of its present loss.

145.    As a direct and proximate result of EMG's justifiable reliance on the aforementioned intentional misrepresentations, EMG has suffered damages in excess of $3,800,000.00.

146.    The conduct of Maz Company and Nader was outrageous, malicious, wanton, willful, oppressive, or done with a reckless indifference to the rights of EMG.

WHEREFORE, Plaintiff Euro Motorcars Germantown, Inc. hereby demands judgment in its favor and against Maz Company and Nader Amirkabirian, jointly and severally, for the following relief:

  a.  compensatory damages in excess of $75,000.00;

  b.  punitive damages;

  c.  prejudgment interest thereon;

  d.  costs; and

  e.  for such other and further relief that the Court deems equitable and just under the circumstances.

## COUNT SEVEN — NEGLIGENT MISREPRESENTATION

### (MAZ COMPANY AND NADER AMIRKABIRIAN)

147.    EMG incorporates the foregoing paragraphs by reference as though set forth herein.

148.    As set forth more specifically above, Maz Company and Nader made material misrepresentations of fact regarding the true sales status of the Stolen Vehicles. Specifically, beginning at least in July of 2010 and possibly well beforehand and continuing through late 2012 and early 2013, while reviewing outstanding used vehicle inventory with representatives of EMG, Nader falsely represented that vehicles were at the Manheim Auction House pending

11328642_13

auction sale, when in fact these very same used vehicles had been sold through the Manheim Auction House prior to the time the false representations were made.  (See specific vehicles identified in Exhibits B and C attached hereto and incorporated herein.)

149.   Maz Company is vicariously liable for the aforementioned acts of Nader because Nader was the owner and sole proprietor of Maz Company at all relevant times, and because Maz Company, acting through Nader, authorized, justified, participated in and/or knew of these misrepresentations as they were being made.

150.   Maz Company is also vicariously liable for the aforementioned acts of Nader as he was acting at all times within the scope of his employment with Maz Company when dealing and communicating with EMG.

151.    Nader's statements regarding the true sales status of the wholesale vehicles were material misrepresentations of fact because of EMG's obligation to timely report and make payment to MBFS upon the sale of each vehicle.

152.   The misrepresentations uttered by Nader were made under circumstances in which he knew or have known of their falsity.

153.   At all times relevant, the means of obtaining accurate answers to the questions posed by EMG were not equal, and Nader and Maz Company both possessed superior information to respond to EMG's inquiries.

154.   The false statements made by Nader to EMG were made with the specific intent of misleading EMG and causing EMG to rely upon them.  These misrepresentations were also made with the specific intent of causing EMG to act based on the misrepresentations by continuing to entrust Manheim, Maz Company and Nader with its wholesale vehicle inventory for sale through the Manheim Auction House, thereby increasing revenues and commissions for

33

Maz Company and Nader.

155.   This deception was successful as EMG reasonably and justifiably relied on Nader's misrepresentations and continued to entrust Manheim, Maz Company and Nader with its wholesale vehicle inventory for sale through the Manheim Auction House.

156.   Had Nader not falsely represented the true sales status of EMG's wholesale vehicle inventory, EMG would have discovered the Ponzi scheme orchestrated by Maz Company and Nader, and thereby would have avoided the entirety of its present loss.

157.   As a direct and proximate result of EMG's justifiable reliance on the aforementioned negligent misrepresentations, EMG has suffered damages in excess of $3,800,000.00.

158.   The conduct of Maz Company and Nader was outrageous, malicious, wanton, willful, oppressive, or done with a reckless indifference to the rights of EMG.

WHEREFORE, Plaintiff Euro Motorcars Germantown, Inc. hereby demands judgment in its favor and against Maz Company and Nader Amirkabirian, jointly and severally, for the following relief:

        a.     compensatory damages in excess of $75,000.00;

        b.     punitive damages;

        c.     prejudgment interest thereon;

        d.     costs; and

        e.     for such other and further relief that the Court deems equitable and just under the circumstances.

## COUNT EIGHT — INTENTIONAL NON-DISCLOSURE

### (MAZ COMPANY AND NADER AMIRKABIRIAN)

159.   EMG incorporates the foregoing paragraphs by reference as though set forth

34

herein.

160.   As described above, beginning at least in July of 2010 and possibly well beforehand and continuing through late 2012 and early 2013, Nader failed to disclose and intentionally concealed the fact that EMG vehicles had been sold without timely reporting of said sales and/or timely remittance of the sale proceeds to EMG.  (See specific vehicles identified in Exhibits B and C attached hereto and incorporated herein.)

161.   Maz Company is vicariously liable for the aforementioned acts of Nader because Nader was the owner and sole proprietor of Maz Company at all relevant times, and because Maz Company, acting through Nader, authorized, justified, participated in and/or knew of these misrepresentations as they were being made.

162.   Maz Company is also vicariously liable for the aforementioned acts of Nader as he was acting at all times within the scope of his employment with Maz Company when dealing and communicating with EMG.

163.   Moreover, Maz Company and Nader each had a duty to speak because they both occupied a relation of trust and confidence vis-à-vis EMG.

164.   Specifically, Maz Company and its sole proprietor, Nader, had an agreement with EMG that provided for, among other things, Maz Company and Nader to timely report and remit auction sale proceeds to EMG for any vehicles sold through the Manheim Auction House.

165.   Additionally, EMG relied on the representations given by Maz Company and Nader as more particularly explained above and, at the time they were made, Maz Company and Nader's representations to EMG constituted one of two primary sources of information related to the physical presence of EMG's vehicle inventory at the Manheim Auction House and/or the issues related to EMG's vehicle inventory were not discoverable by other reasonable means.

11328642_13

166.    Maz Company and Nader both also had a duty to speak because disclosure of the facts related to the previously sold and missing EMG inventory was necessary to prevent an ambiguous or partial statement from being misleading. That is, in verifying the outstanding inventory with EMG, Maz Company and Nader, at best, provided EMG with ambiguous and incomplete information related to EMG's vehicle inventory at the Manheim Auction House.

167.    Finally, Maz Company and Nader each had a duty to speak because the undisclosed fact that EMG's vehicle inventory had been sold and was not physically present at the Manheim Auction House was a fact that was basic to the business transactions between EMG and Maz Company.

168.    The misrepresentations made with respect to the true sales status of EMG's wholesale vehicles were material facts because of EMG's obligation to timely report and  make payment to MBFS upon the sale of each vehicle.

169.    The concealment of these facts by Nader was intentional and knowing. Alternatively, the concealment was undertaken by Nader with reckless disregard of his and/or Maz Company's duties to EMG.

170.    At all times relevant, the means of obtaining accurate answers to the questions posed by EMG were not equal, and Maz Company and Nader each possessed superior information to respond to EMG's inventory questions.

171.    EMG entrusted its valuable wholesale vehicle inventory to Maz Company and Nader for sale through the Manheim Auction House. Maz Company and Nader accepted this wholesale vehicle inventory thereby creating a duty to truthfully, accurately and timely account to EMG for the sales of EMG's wholesale vehicle inventory and the sales proceeds generated therefrom.

172.   The intentional concealments by Maz Company and Nader to EMG were undertaken with the specific intent of misleading EMG into believing that the wholesale vehicles were still present at the Manheim Auction House awaiting auction sale and these concealments were undertaken with the specific intent of causing EMG to act based on this misconception by continuing to entrust Maz Company and Nader with its wholesale vehicle inventory, thereby increasing fees, commissions and revenues to Maz Company and Nader.

173.   This deception was successful as EMG reasonably and justifiably relied the misrepresentations and concealed facts and continued to entrust Maz Company and Nader with its wholesale vehicle inventory for sale through the Manheim Auction House.

174.   Had Maz Company and Nader not intentionally concealed the true sales status of EMG's wholesale vehicle inventory, EMG would have discovered the Ponzi scheme orchestrated by Maz Company and Nader, and thereby would have avoided the entirety of its present loss.

175.   As a direct and proximate result of EMG's justifiable reliance on the aforementioned intentional misrepresentations and concealments, EMG has suffered damages in excess of $3,800,000.00.

176.   The conduct of Maz Company and Nader was outrageous, malicious, wanton, willful, oppressive, or done with a reckless indifference to the rights of EMG.

WHEREFORE, Plaintiff Euro Motorcars Germantown, Inc. hereby demands judgment in its favor and against Maz Company and Nader Amirkabirian, jointly and severally, for the following relief:

a.   compensatory damages in excess of $75,000.00;

b.   punitive damages;

c.   prejudgment interest thereon;

d.   costs; and

11328642_13

  e.  for such other and further relief that the Court deems equitable and just under the circumstances.

**COUNT NINE — CONVERSION**

(MAZ COMPANY AND NADER AMIRKABIRIAN)

177. EMG incorporates the foregoing paragraphs by reference as though set forth herein.

178. As more particularly described above, Maz Company and Nader interfered, without lawful justification, with EMG's use, possession and right of two particular property assets - the Stolen Cars and the Proceeds.

179. As more particularly described above, Maz Company and Nader were entrusted with EMG's wholesale vehicles, with the explicit knowledge and understanding that EMG was the owner of all such property.

180. Maz Company and Nader knew and understood that EMG had an immediate right to possess the Stolen Cars and the Proceeds generated therefrom by virtue of the fact that EMG was the record owner of the vehicles at the time they were entrusted to Maz Company and Nader for sale through the Manheim Auction House.

181. Maz Company and Nader committed conversion in the following five ways: (1) by intentionally disposing the lawful possessor, EMG, of the Stolen Cars and of the Proceeds through the fraudulent scheme of misrepresenting the true sales status of EMG's wholesale vehicles supposedly at the Manheim Auction House; (2) by intentionally using chattels in their possession, *i.e.* the Stolen Cars and the Proceeds, without authority to so use them; (3) by receiving chattels, *i.e.* the Stolen Cars and the Proceeds, pursuant to an undisclosed sale with the intent to improperly acquire for themselves or for another a proprietary interest in it; (4) by

38

disposing of chattels, *i.e.* the Stolen Cars, through an undisclosed sale with intent to transfer a proprietary interest to another; and (5) by refusing to surrender chattels, *i.e.* the Stolen Cars and/or the Proceeds, on EMG's demand, as EMG was entitled to lawful possession of the same.

182.   Maz Company and Nader had possession of the Stolen Cars immediately before converting the same and turning over the Stolen Cars to Manheim and/or auction purchasers through the Manheim Auction House.

183.   Maz Company and Nader had possession of the Proceeds after the Stolen Cars were converted and the proceeds paid directly to Maz Company and Nader by Manheim.

184.   EMG did not consent to the interference by Maz Company and Nader with EMG's property as described above.

185.   Maz Company and Nader acted without lawful justification when they interfered with EMG's aforementioned property.

186.   EMG has suffered damages as a result of the interference by Maz Company and Nader, the value of which as of the date hereof is in excess of $3,800,000.00, excluding court costs and interest.

187.   The conduct of Maz Company and Nader was outrageous, malicious, wanton, willful, oppressive, or done with a reckless indifference to the rights of EMG.

WHEREFORE, Plaintiff Euro Motorcars Germantown, Inc. hereby demands judgment in its favor and against Maz Company and Nader Amirkabirian, jointly and severally, for the following relief:

    a.    compensatory damages in excess of $75,000.00;

    b.    punitive damages;

    c.    prejudgment interest thereon;

    d.    costs; and

11328642_13

e.      for such other and further relief that the Court deems equitable and just under the circumstances.

## COUNT TEN — BREACH OF CONTRACT

### (MAZ COMPANY AND NADER AMIRKABIRIAN)

188.    EMG incorporates the foregoing paragraphs by reference as though set forth herein.

189.    As more particularly described above, a legally enforceable contractual agreement existed between Maz Company, Nader and EMG with respect to EMG's wholesale vehicle inventory at Manheim.

190.    The terms of that contract provided for, among other things, Maz Company and Nader to timely report and remit auction sales proceeds to EMG for any vehicles sold through the Manheim Auction House.

191.    Maz Company and Nader breached its contract with EMG by failing to timely report the auction sales and failing to pay EMG the Proceeds.  It also breached its contract with EMG by failing to keep EMG informed on the true sales status of the vehicles sold through the Manheim Auction House.

192.    EMG has suffered damages as a result of these contractual breaches by Maz Company and Nader, the value of which as of the date hereof is in excess of $3,800,000.00, excluding court costs and interest

WHEREFORE, Plaintiff Euro Motorcars Germantown, Inc. hereby demands judgment in its favor and against Maz Company and Nader Amirkabirian, jointly and severally, for the following relief:

a.      compensatory damages in excess of $3,800,000.00;

b.      prejudgment interest thereon;

    c.     costs; and

    d.     for such other and further relief that the Court deems equitable and just under the circumstances.

## COUNT ELEVEN — QUASI CONTRACT / UNJUST ENRICHMENT

### (MAZ COMPANY AND NADER AMIRKABIRIAN)

193.    EMG incorporates the foregoing paragraphs by reference as though set forth herein.

194.    EMG conferred benefits on Maz Company and Nader by virtue of Maz Company and Nader's receipt of the Proceeds

195.    EMG further conferred benefits on Maz Company and Nader at the time each of the Stolen Cars were sold through the Manheim Auction House by virtue of Maz Company and Nader's receipt of fees associated with each sale.

196.    Maz Company and Nader received and appreciated these benefits.

197.    Given the pervasive and wide-ranging fraud discussed above, Maz Company and Nader's acceptance and retention of these benefits under such circumstances without paying their value back to EMG would be inequitable.

198.    EMG has suffered damages as a result of the Manheim's unjust enrichment, the value of which as of the date hereof is in excess of $3,800,000.00, excluding court costs and interest.

WHEREFORE, Plaintiff Euro Motorcars Germantown, Inc. hereby demands judgment in its favor and against Maz Company and Nader Amirkabirian, jointly and severally, for the following relief:

    a.     damages in excess of $75,000.00;

    b.     prejudgment interest thereon;

    c.      costs; and

    d.      for such other and further relief that the Court deems equitable and just under the circumstances.

### COUNT TWELVE — CIVIL CONSPIRACY

### (MANHEIM AUCTIONS, INC., VICKIE MANCHESTER, MAZ COMPANY AND NADER AMIRKABIRIAN)

199.    EMG incorporates the foregoing paragraphs by reference as though set forth herein.

200.    As more particularly described above, Manheim, Manchester, Maz Company and Nader conspired and combined to undertake several unlawful acts designed to defraud EMG from proceeds generated by the resale of its wholesale vehicle inventory through the Manheim Auction House.  Alternatively, Manheim, Manchester, Maz Company and Nader combined to undertake lawful acts by unlawful means and/or for an unlawful purpose – *i.e.* to enrich themselves by defrauding EMG.

201.    The overt acts done in pursuance of this common purpose involve the fraudulent misrepresentations and omissions pled in the aforementioned causes of action set forth above against Manheim, Manchester, Maz Company and Nader, which are now incorporated herein.

202.    EMG has suffered damages as a result of this combination and scheme, the value of which as of the date hereof is in excess of $3,800,000.00, excluding court costs and interest.

203.    The conduct of Manheim, Manchester, Maz Company and Nader was outrageous, malicious, wanton, willful, oppressive, or done with a reckless indifference to the rights of EMG.

WHEREFORE, Plaintiff Euro Motorcars Germantown, Inc. hereby demands judgment in its favor and against Manheim Auctions, Inc., Vickie Manchester, Maz Company and Nader Amirkabirian, jointly and severally, for the following relief:

a.      compensatory damages in excess of $75,000.00;

b.      punitive damages;

c.      prejudgment interest thereon;

d.      costs; and

e.      for such other and further relief that the Court deems equitable and just
        under the circumstances.

Submitted by:

/s/ Matthew Faranda-Diedrich

Dated:  December 27, 2013

Matthew Faranda-Diedrich, Esquire
PA Attorney I.D. No. 203541
DILWORTH PAXSON LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102-2101
Email:  mfd@dilworthlaw.com
(215) 575-7000 – Telephone

John B. Consevage, Esquire
PA Attorney I.D. No. 36593
DILWORTH PAXSON LLP
112 Market Street, 8th Floor
Harrisburg, PA  17101
Email:  jconsevage@dilworthlaw.com
(717) 236-4812 – Telephone
*Attorneys for Plaintiff,*
*Euro Motorcars Germantown, Inc.*